May I please report, your honors, I represent the Faulkner County appellants in this NRA interlocutory appeal related to the denial of qualified immunity. This case involves the presence of mold in the jail showers at the Faulkner County Jail in Cumberland, Arkansas. The Honorable Magistrate Judge proceeding here by consent, in his opinion, cited to the broad general duties for constitutional conditions of confinement, but in so doing, because he focused so broadly, actually imposed a standard that has not been imposed in this circuit or anywhere else that I've been able to find. Namely, that prisoners have the right to be free from the mere presence of environmental allergens, in this case, mold, which the plaintiff's own expert witness in this case, the prisoner's expert witness in this case, testified was just that, an environmental allergen akin to pollen, ragweed, or grass or dust mites. Counsel, let me ask a question about that. I think you've hit on an important point there. The two parties in this case have described the constitutional right at issue in dramatically different terms. You've described it very, very narrowly, and they've described it very, very broadly. Who gets to decide and how does the court determine what right is at issue? Well, certainly by looking to the U.S. Supreme Court. The U.S. Supreme Court has decided a number of qualified immunity cases in certainly the last five years, in a number of contexts, most notably and frequently in the excessive force context, but certainly in a number of other contexts, as has this court. This court came down on a qualified immunity case that I was involved in earlier this week, or end of last week. The Supreme Court's guidance on this point is very clear and has been reiterated repeatedly, that the contours of the right must be particularized, such that a reasonable official would know what the right or the attendant duty would be. Here, there's the right pressed by the district court and the appellees, the prisoners, is some broad right to generally sanitary conditions. Well, more to the point, counsel, is my rough take on the appellee's brief is that it relies, as did the district court, on cases between the period of 1974 and 1994, and that means we're talking about 26 years of federal appellate jurisprudence that nobody cites regarding this constitutional right to sanitary conditions. What's happened since 1994? Significant developments, both in the law of qualified immunity and the law related to conditions of immunity. You've properly cited White v. Pauley in the recent cases that, frankly, appellees have unfortunately ignored, but I'm going more to Judge Graz's point about what have the federal appellate courts done to clarify the very general law that started in Arkansas with Hutto v. Finney in about 1973. Hutto v. Finney was very broadly written, but it wasn't damage liability. For the most part, it was prospective reforms, much needed in many ways, of the prison system, which had decayed, so to speak, but now we're talking damage actions for violation of clearly established rights to what? Unsanitary conditions. That doesn't tell me anything. Right, and as in any number of other contexts in civil rights and constitutional litigation, the right has been significantly narrowed over the years. As cases have come up, and this and other courts of appeals have consistently rejected the multitude of, it's the most commonly filed case in federal court, the multitude of conditions of confinement claims. The right has been significantly narrowed, and here in this case, we're talking about something that the prisoner's own expert witness testified. You just said the right. I asked recent cases defining the right, and your answer is the right has been significantly narrowed. Can you give me a case addressing unsanitary conditions that's been decided at least in this century, and hopefully in the last decade, that talks about how courts should define and limit or not limit this broad concept? I believe we did in the briefing, and I'm sorry, I can't call one of mine at this time. Well, I was kind of looking for it, and I didn't see much. I mean, your reply brief was hammered on the particularization point, but now we're talking about how do you particularize here? It's the point that in this case, in this context where there is so much litigation, where no one's shy about filing lawsuits related to conditions of confinement. It is such a broad part of the federal court's docket, and yet there are no cases that have said the mere presence of an environmental allergen constitutes an unconstitutional condition of confinement. How could there ever be such a case if it relies on the existence of a previous case on exactly that particularized issue? Do you see what I'm saying? I mean, the clearly established right doctrine seems to sort of freeze in time what could be qualified as an unconstitutional condition of confinement, unless courts are allowed to take the general doctrine and particularize it in new situations. Well, certainly that used to be the case. I think that changed with the Supreme Court's opinion in Pearson v. Callahan. Let me just stop there, because it's not qualified immunity damage cases where you might find the particularization. It could be hero v. Phinney type cases, broad attacks on a range of allegedly unsanitary and unsafe conditions of confinement, which would produce clarifying equitable decrees, granting and then some, you know, some and denying and so forth. Those would be highly relevant, but they don't seem to... I don't know where they are, because the council didn't help me find them. I'm talking about in the last decade or so. Right, and particularly in the context of what's alleged here, an environmental allergen, the presence of that. But Pearson v. Callahan said that the two prongs of qualified immunity articulated in Saucier v. Katz could be decided in either order. And so the court can now decide the constitutional question either before or after deciding whether the question is clearly established. And so courts are now free to do that. Again, none of them have with respect to this question, whether the presence of an environmental allergen that can't be eradicated, that causes allergic symptoms regardless of quantity, so reduction is not helpful. None of those things have ever been found to be an unconstitutional condition of confinement in this circuit or any other. Nor should they. As we articulated in our briefing, we're all exposed to environmental allergens. Dr. Ingram, the prisoner's expert witness in this case, said that essentially any room with carpeting, any shower area has some presence of mold, and that regardless of the quantum of that mold, allergic symptoms will or may happen, is what he said, to the allergic. Now, interestingly, the court, the court below, denied summary judgment in qualified immunity with respect to all of these prisoners, four of the six of which were not even allergic to mold. Counsel, let me ask you about that. What if there was a situation where one of the plaintiffs was deathly allergic to mold, how would we define the constitutional right that is at issue in that case? Well, first of all, I don't think Dr. Ingram testified about deathly allergies. Certainly, I think our common experience dictates that some people have more severe allergies than others, and some of them it's, now, I've not known that to be the case in my own experience, except with things that are ingested, like peanut butter and the like, where your throat seizes up. I think that's how allergies cause death, is when your throat swells up and closes. Mold doesn't do that, at least according to Dr. Ingram's testimony. Instead, it produces the classic allergy symptoms, like pollen, ragweed, grass, none of which, to my knowledge, kill people. Does an inmate with a severe peanut allergy have a constitutional right to be free of a confinement with peanut butter? Yes, and I think that's different. Well, I'll say this, I'm not sure I know of a case that has said that, and so maybe qualified immunity would be the order of the day in that case, too, but there's a difference between ingestible allergens versus environmental allergens, both with respect to ubiquity and with respect to the ability to eradicate or separate people from those things. Dr. Ingram testified, you can't separate folks from mold. You can't separate these prisoners from these airborne environmental allergens, and a reduction essentially does no good. I'm just trying to figure out what the constitutional right is. Well, it would be the broad constitutional right to unconstitutional conditions of confinement. The Supreme Court has said that means it has to affect the deprivation of a single identifiable human need, like warmth or nutrition, those kinds of things. Allergies simply don't do that. In real life and in a jail, there would have to be an acceptable and an unacceptable levels of the presence of allergens, certainly an allergen like mold that is also unsightly and affects, if it were, let's say on your clothing or your bed or something like that would affect the use of your items. If it's in your shower, it would affect your use of the shower. It's not your position that if it doesn't deprive them of life, they have no claim to have mold removed, no matter what the quantity or where it appears. Well, first of all, let me speak to the point that what the prisoners saw in this case was indisputably not mold. The prisoners in this case testified uniformly to seeing a black sticky substance on the walls. Dr. Ingram testified that that could only be black mold, but that black mold was not present in the jail. But the Atoko report, if I'm pronouncing that correctly, did find the presence of a certain kind of mold, and I understand there's a disagreement in the record about whether that particular kind of mold poses a health risk, but whatever kind of mold was on their showers, at a certain level, let's say it appears in any moist conditions, right? Let's say it starts appearing on other surfaces, not just the showers, but surfaces they need to sit on or lie down on. At some point, would it reach the level of an unconstitutional, unsanitary condition? I don't think so. Let me try to explain that. What you're articulating has great common sense appeal. Surely there's got to be a level at which, but Dr. Ingram's expert testimony on this point was the quantum of the mold has no effect, essentially, on the allergic reaction of those around. Those without allergies would have absolutely no reaction, regardless of the quantum. Those with allergies would have a similar reaction, regardless of the quantum. So to the extent that prisons clean up mold and other substances off the wall, they're just doing that as a gratuitous act of kindness? They're not required to do that in order to keep jails sanitary? I think it was ultimately what the court had a problem with below when it called this mold, quote, unsightly. The problem with that is if an unsightly condition is an unconstitutional condition of confinement, every prisoner in America has a case. The inside of jails are not pretty. They're just not. And I say I'll run into my rebuttal time, so if there are no further questions at this time, I'll reserve. Thank you. Mr. Brunson? Your honors, may it please the court, Matt Brunson here on behalf of the Apple East. I just want to get right to the point, having had the benefit of watching the last hearing, to pick up on where your honors left off. I think the poignant point where this needs to go is the second prong. Whether there's a violation. So before we get into the clearly established right, when your honors are asking, well, how do we know what is sanitary conditions and how do we know if it's not, you look into whether that right has been violated. That's what liability would ultimately turn on is we look at the objective and subjective prongs of the violation prong of qualified immunity, right? No, no, we're looking at what the right is. Just like we did in our in-bank case in Dillard. Yes, your honor. That was kind of unique because the Supreme Court told us it didn't exist. Here is the more typical situation where we're trying to define it. Yes, your honor. We have to define it before we can decide whether you've got a sufficient case of violation. Sure. And then in qualified immunity, we have to focus on the personal involvement of each of these individual defendants, which it seems to me you haven't done much at all about. So with respect to the clearly established right. No, no, we're still, I'm still, I'm with you on the, I think it's the first prong of Pearson, but the constitutional violation. So you said all the rights there, all I have to do is prove it's violated. And we're just getting started by saying, wait a minute, I don't know what the right is. So if there's a right to adequate sanitation, then it's defining that right. What does that mean? What does adequate sanitation mean? And the cases are replete with various circumstances as to how that arrives. That could be feces on the wall. That could be a toilet that doesn't flush. I would like you to focus on cases from this century. Yes, your honor. Which your brief did not do. Any case similar to this one. You know, I was looking hard for a case that involved something like mold or an environmental allergen or substance on the wall, you know, other than feces, which, you know, is its own, arguably its own category of risk factor. Sure. And I always thought the court to the right case says that there doesn't have to be a case on point for there to be a violation. And so in reference to an analogous case, I'll reference the court to Howard. There, it was a feces case. There were issues with the mattress. And that court pointed out a number of things that we need to take into context in a totality of a circumstances analysis as to whether there's a clearly established right. That is the temporal scope. We've got two cases that I thought in my brief that I just want to quickly distinguish is Smith and Wittnick. Those cases, it was a four hour case and it was a four day case. And the court made a very poignant point, so to speak, that it concerns the time that you're subject to conditions. So they ask how bad it is and how long did it occur or how long did it occur and how bad was it? What are the years of those cases, please? Your Honor, I apologize. I don't have that. And I should have been prepared for that off the top of my head. But Howard, I look at that as an analogous case with respect to the fact that the court found that the defendants violated their own rules in that case. So I cited the policy that the jail has on sanitation. That policy provides that they provide a clean and healthful environment. And I'm piecemealing this. They shall be kept in the highest degree of cleanliness possible. The cells and day rooms shall be maintained in the sanitary and orderly conditions. And why that's important is that- The three cases you cited were cited from your table of authorities between 1989 and 1996. Smith. And so, again, I'm looking for something. I think Judge Pitlick has tried to find something in the last 25 years where this general concern first articulated by Inhuto when the Supreme Court affirmed Judge Henley's decision in Arkansas. Where do we go with this? We're doing generality, for lack of a better term. Yes, Your Honor. And I'm not going to be able to sit here and cite you to a specific case. What I can cite you to is the foundational principle of the Eighth Amendment looks at decency and humanity. And the courts have said that we have to- An unusual punishment. Yes, Your Honor. And in that regard, it looks at the overarching models of decency and that that does evolve. And so, while I can't cite you to a case, I can cite you to the jail's policies, which I cited the sanitation policy in my brief. But it piggybacks off the philosophy of the operation, which it says, The detention facility shall be operated in a constitutional manner in compliance with Arkansas jail standards. Shall provide a safe- Doesn't it say it needs to keep them as clean as possible? And doesn't the record describe efforts to try to remove the mold that were ultimately unsuccessful? Well, so, I'm going to answer your question in two parts if I may. As for looking for precedent or any case law out there that says, Hey, this is an established right, this policy continues to provide the conditions of confinement must be safe, sanitary, and orderly. The detention facility must provide for the basic sanitation and hygiene. And so, clearly, the detention center has noticed that there is an established right to sanitary conditions. They are trying to comply with that. And with respect to the second part of your question, as to a violation, that gets into the second prong, which gets into a fact. Which the murder court found that there were issues of fact with respect to not only the objective- Well, not only the objective prong of the violation- Sorry, subpart, objective prong of the violation prong, but also the subjective prong. Because the evidence established that there were issues of fact with regard to what Atoka thought was dangerous and what Dr. Ingram thought was dangerous. Dr. Ingram said that certainly people could be harmed. That goes to the objective prong. The court took issue with when Captain Reed Mueller was aware of this and when they took any action. As to when Lieutenant Andrews was aware of this and took any action. And so we're getting into issues of fact there, which I think on an interlocutory appeal, it's only a question of law. And if we get into the questions of fact, we're asking this court to presume the factual assumptions the lower court made. To shift and rule on issues of fact against the non-moving party, my client- Sorry, let me just tell you, I didn't think I was getting any questions of fact so much as your suggestion that they violated their own policy. My recollection of reading the briefing was that the policy stated that the person in charge of the jail was responsible for keeping it as clean as possible. I think there was some language in there that seemed to me a little slippery. And made it an open question whether they had violated their own policy or not. And so I was just wondering if you could account for- I wanted to hear more about your theory that they had violated their own policy. Well, and sorry if I'm not answering your question in the order you'd like it. I wanted to address your last question on precedent. That's why I referenced the policy of, hey, they recognize this. With respect to violation, I'm happy to address how that arose. And that's what the lower court found. There was a question of fact in regards to who was responsible to clean. Did they do it? What materials and chemicals were they provided in order to do so? When did they know and when did they do anything? And that is all the second violation problem. Which is clearly a question of fact. It's our position that that's a slippery slope. I know that qualified immunity and the merits of the case can override each other. But for this court's limited review, we're talking about issues of law. What is the basis for supervisor liability here? Other than what is precluded by the Supreme Court? If you are asking about their official or individual capacities? Well, this is a qualified immunity appeal. All we care about is the individual damage liability of seven defendants. I'm not sure I understand your question. So what is the basis of the sheriff? I'd have to go to the opinion to identify each of them. But some of them are just the ultimate person in charge of the facility. Counsel, let me ask this. Who was it that ignored all the recommendations of the consultant that gave them ideas for how to get rid of them all? So the testimony established that Lieutenant Andrews did not actually  Lieutenant Andrews reports to Captain Reed Mueller. Both were aware of the issues. The timing at which they were aware is the question. The testimony was not clear on that point. There was conflicting testimony. Again, circling back to why this is asking this court to look into the merits and the factual issues that the court had already ruled there was a genuine issue on. Excuse me. Sorry, Mr. Andrews, who did not read the report. Is he the one who was briefed, however, on whether or not the mold was a health issue at the end of the investigation? Lieutenant Andrews briefed Captain Reed Mueller. Okay. So how did Lieutenant Andrews learn what was in the report if he didn't read it? Atoko briefed him and he briefed Captain. I'm sorry. I missed your question. Lieutenant Andrews was the one going to Captain Reed Mueller. Captain Reed Mueller received the report. So he received the report back. And reviewed it and briefed Lieutenant Andrews? I really am truly just trying to get a handle on who knew what when. So let me back up as best I can. Lieutenant, there was a grievance process. And the grievances started in June of 2016. So I had a question about that, too, based on your brief. Because several times in your brief it cites that they knew about it in, quote, late 2016. And then elsewhere it says that they brought grievances in June of 2016. And since this suit appears to have been brought in early 2017, that makes a difference in the timeline. Whether it was December of 2016 or June that they brought their grievances up. I apologize. I can't cite the deposition testimony specifically. I can't cite the first grievances. But they were established, and I believe it was during Lieutenant Andrews' deposition that he said he was made aware in June 2016. We have these plaintiffs here that were out of minimum detainees for three months and out of maximum nine months. So, again, the temporal scope is key. So it's asking when were they aware? Well, I think the testimony will establish that it was June 2016. Grievances started and continued at least in February through end of April 2017. Formal complaints were filed thereafter. And the testimony will establish that action was not taken until after formal complaints were filed. A TOGA inspection came after that. There's a question of fact as to the 309s, which is a type of... I understand the fact question. But what case has held that a supervising, the head of a facility who was made aware that a grievance remedy was attempted but was not entirely successful, is individually liable for damages for that lack of success? With the 1983 claims, and we look at the function of the officers who were state employees, I think that's where your honor is going with that. But there's no vicarious liability, or supervisor liability. What's the action taken? So we're just talking about a failure to act on a report that a remedy was unsuccessful. Give me a case where qualified immunity has been denied on that kind of a claim. So I think that would have to be analyzed with respect to each defendant that's been named. That's what our cases say has to be done on a qualified immunity appeal. With respect to Sheriff Riles, that was a respondeat superior. That's what the lower court said, analyzed him in the context of respondeat abilities. But I don't understand why the other supervisory people... So the guy that didn't clean the wall well enough, the 309 inmate, maybe he should have been a defendant. But why is the person two or three steps up the grievance process, totem pole, individually liable for a bad wall cleaning? I think that turns on just state employees in this chain of command as to who had knowledge, who was it related to, and who was... This is county of Sacramento versus Brown. Basic stuff about individual liability versus... And how difficult that is to establish once you don't... Once respondeat superior is not a basis for 1983 liability. And I don't see it here. The grievance process was direct to Lieutenant Andrews. He had direct involvement in that. And Captain Reed Mueller, who was over Lieutenant Andrews, was there for any appeal of a grievance process. And so that's where the personal involvement comes in. It's that once Lieutenant Andrews had knowledge reported to Captain Reed Mueller, who was over him, over the jail, he had knowledge at that point. But what's the violation by those people? For not addressing the harm that was relayed in these grievances, not addressing that harm after being made aware of that harm, and being subjective or being indifferent to that harm or recklessly disregarding that harm by not taking any action for a significant amount of time thereafter. I see that your time is up, but does the harm... Is that argument affected at all by the fact that we now know that four of these six individuals would not have been affected by the presence of Mould? Well, Your Honor, to be clear on that, Dr. Ingram presented testimony on three of the individuals. Okay. So that's on the record as to who he was there to opine on. There's not any evidence in the record as to what he said about these three other individuals. Okay. From his testimony, that's... And the three individuals that he testified about were all allergic to Mould? I would have to put what strand. There's a multitude of strands. The kind of Mould that's present in the... We're clearly talking about whether these people were recklessly indifferent to harm that was happening to their prisoners as a result of an unsanitary condition. And there's evidence in the record that certain ones of these individuals could not have been harmed by the presence of that particular unsanitary condition. And I'm wondering if that affects our evaluation of whether this was reckless disregard. I think that's a causation and damage issue that's a question of fact for the jury, ultimately. Whether we can prove the case, if we establish a clearly established right, and there's a question of fact as to a violation, that goes to the jury. And that's not proper for purposes of this interlocutory field. Okay. I guess then that we'd have to wonder whether the establishment of a clearly established right would depend in some way on the fact that a small percentage of people would be affected by the presence of Mould. Is that more in the line of what we should be concerned about? I think if there's a possibility... Well, it's not if. The case law has said there has to be a human need that's been deprived, and so you would look at that harm. That comes into the qualified immunity analysis, and whether that's clearly established is a separate issue as to the case law and what's out there. Okay. Thank you. Thank you, Your Honor, for your time. Thank you. I found the case I was looking for, and I'll file a Rule 28J letter on this because it is an interim opinion, but it's an opinion by the Eastern District of Missouri, Kincaid v. Holder, which cited similar district court opinions in Georgia and Louisiana where Judge White held, quote, mere exposure to Mould or Mildew does not amount to an excessive risk to health or safety as required to state a claim premised upon unconstitutional conditions of confinement. It's interesting that Judge White used the word excessive there, which is used interchangeably with the word substantial to modify the word risk in all deliberative difference cases decided by U.S. Supreme Court. The point being that the risk has to be greater than that attendant to walking around on planet Earth or even living in a jail. It has to be an excessive or substantial risk that exceeds those normally attendant risks that we all face, and particularly the prisoner's face. That's just not present here. There's never been a case that's found arriving in that situation. Thank you, Your Honor. Very good. Thank you, counsel, for a helpful oral argument and for helping us navigate the new technology. The case has been well presented, well briefed and argued, and we'll take it up in advisement. Thank you.